## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

VALERIE E. CAREY,

                         **Plaintiff,**

     **v.**　　　　　　　　　　　　　　　　　　　　**1:06-cv-2589-WSD**

**BELLSOUTH SHORT TERM DISABILITY PLAN,**

                        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant BellSouth Short Term Disability Plan's ("BellSouth STD Plan" or the "Plan") Motion for Summary Judgment [25]. Also before the Court is BellSouth's Motion to File Supplemental Statement of Undisputed Facts and Accompanying Documents [35] and Plaintiff Valerie E. Carey's ("Carey") Motion to Enlarge Time to File Response to Defendant's Motion for Summary Judgment [36].[1]

---

[1] Having reviewed BellSouth's submission of additional material facts, the Court GRANTS BellSouth's Motion to File Supplemental Statement of Undisputed Facts [35].

## I.     BACKGROUND

Carey was employed as a Regulatory Manager for BellSouth Telecommunications, Inc. ("BellSouth").  Carey was enrolled in the BellSouth STD Plan, an employee benefits plan under the Employment Retirement Income Security Act, 29 U.S.C. § 1001 et. seq. ("ERISA").  The BellSouth STD Plan was administered by Broadspire, who has authority to interpret the Plan and to make claims determinations.

### A.     The Plan

The STD Plan defines "disability" as "a medical condition supported by objective medical evidence which . . . makes a Participant unable to perform any type of work as a result of physical or mental illness or an accidental injury." (STD Plan at § 2.10.)  "Any type of work includes the following, regardless of availability: (a) the Participant's regular job with or without accommodations, (b) any other Participating Company job with or without accommodations, or (c) temporary modified duties." (Id.)  The STD Plan defines "Participating Company job" as "any job within a Participating Company or any job outside a Participating Company, which is comparable in skills and functions." (Id.)

B.      Carey's Claims for Benefits

On September 17, 2004, Carey took a leave of absence and applied for short term disability ("STD") benefits.  Carey cited depression as the reason for her request for leave and STD benefits.

On October 1, 2004, Dr. Joyce Irons ("Dr. Irons"), Carey's treating psychologist, examined Carey and stated that she was unable to work in any capacity.  Dr. Irons was unable at that time to project when Carey would be able to return to work.  On October 7, 2004, BellSouth denied Carey's claim for STD benefits, and asked her to return to work by November 16, 2004.  Carey returned to work on November 16, 2004.  On November 18, 2004, Carey appealed the denial of benefits.

On January 13, 2005, Carey's appeal was granted and the denial of benefits was reversed.  Carey's request for STD benefits was reinstated for the period of September 24, 2004 to November 15, 2004.

On April 29, 2005, Carey sought another leave of absence and further STD benefits, again citing depression.  Broadspire approved STD benefits for Carey though the end of June, 2005.

On May 13, 2005, Dr. Irons submitted a Behavioral Health Questionnaire stating that Carey was experiencing daily panic attacks, hyperventilation, sweats, uncontrollable crying, and other impairments.  A peer review was conducted on this information by Barry Glassman ("Dr. Glassman").  Dr. Glassman concluded that Dr. Irons's May 13, 2005 Questionnaire supported a finding that Carey was disabled, as defined in the Plan.  On May 23 and June 3, 2005, Dr. Irons examined Carey and found her on both occasions still to be disabled.

On June 8, 2005, Broadspire contacted Carey and requested that she return to work by the end of June, 2005.  On June 28, 2005, Dr. Irons, in response to requests from Broadspire, completed a Behavioral Health Clinician Statement Update ("June 28 Update") regarding Carey's condition.  In the June 28 Update, Dr. Irons stated that Carey continued to suffer serious mental health problems.  Dr. Irons checked a box on the first line of the form stating that Carey was unable to perform her own occupation.  Dr. Irons did not check a box that would indicate that Carey was unable to work in any occupation.  The end of the form contained a section titled, "Claimant return to work status."  The section contained three boxes–a box for setting a date for release to work full duty, a box stating "able to work with the following modifications," and a box stating "unable to work at this

time." Dr. Irons checked the box stating "unable to work at this time." Dr. Irons entered a comment under in the "able to work with modifications" box–although he did not check that box–stating, "very limited depending on work load. If returned, recommend ½ days for a couple of weeks." A follow-up question asked, "Please comment on reasons clamant is unable to return to work." Dr. Irons answered that question, stating "Not reliable, unpredictable, extremely stressed." Broadspire found that this evaluation did not support continued disability benefits.

Dr. Ross Grumet ("Dr. Grumet") was another of Carey's treating physicians. Dr. Grumet, a psychiatrist, administered Carey's pharmaceutical treatment regimen. Dr. Grumet also submitted Behavior Health Statements to Broadspire. Dr. Grumet's Behavior Health Statements consistently recommended that Carey be permitted to take disability leave. Dr. Grumet does not appear to have ever cleared Carey to return to work.

On July 8, 2005, Broadspire demanded that Carey submit to an independent medical examination to occur on September 8, 2005. Prior to the independent medical examination, Broadspire requested another peer review of Carey's STD benefits claim. This peer review was conducted by Lawrence Burstein ("Dr. Burstein"). On July 7, 2005, Dr. Burstein spoke with Dr. Irons. Dr. Burstein

found that Dr. Irons had difficulty stating exactly the specific impairments Carey

suffered that kept her from engaging in any employment.

Dr. Burstein also reviewed an Application & Certification for Leave form

completed by Dr. Grumet on July 22, 2005 ("July 22 Leave Form").  On the form,

Dr. Grumet checked a box indicating that Carey required "Absence plus

treatment."  In the section of the form that asked, "Indicate the medical facts that

support your certification, including a brief statement as to how the medical facts

meet the criteria of one of the above categories," Dr. Grumet wrote, "Depression

preventing her from functioning at work requiring psychiatric treatment."  In

response to the question, "Is the patient incapacitated as a result of this condition,"

Dr. Grumet checked the box stating "Yes."  In response to the question "If medical

leave is required for the employee's absence from work, is the employee able to

perform work of any kind?" Dr. Grumet checked the box indicating "Yes."  Dr.

Grumet indicated, however, that Carey was unable to perform the essential

functions of a Regulatory Manager.  Dr. Grumet stated that Carey was incapable of

performing functions such as being able to "attend to paperwork details," "relate to

other employees," and "attend job site regularly."

Dr. Burstein concluded that he could not substantiate that Carey was incapable of "performing any work" from July 1, 2005 to August 1, 2005. Dr. Burstein further found that Carey appeared, from the record, likely able to perform unskilled or semi-skilled labor, but admitted that her actual capacity for specific types of work could not be determined. Dr. Burstein concluded that the record did not show sufficient information to justify the conclusion that Carey was unable to perform work of any kind.

On August 27, 2005, Dr. Grumet filled out another Broadspire "Behavioral Health Clinician Statement." Dr. Grumet checked a box indicating he recommended that Carey stay home from work. Dr. Grumet commented that Carey was "unable to attend work," "regularly unable to concentrate on details," "unable to relate consistently with others," and that these impairments were "all resulting from psychiatric illness." Dr. Grumet checked a box indicating that Carey had "suicidal ideations" and was a risk to herself or others. One section of the Statement contained boxes providing three options: (1) "released to work full duty"; (2) "able to work with accommodations"; and (3) "unable to work at this time". Dr. Grumet checked the box stating that Carey was "unable to work at this time."

On September 8, 2005, Dr. Eugia Littlejohn ("Dr. Littlejohn") conducted the independent medical examination of Carey demanded by Broadspire.  Dr. Littlejohn concluded that Carey suffered major depression and bipolar disorder. Dr. Littlejohn also concluded that Carey had an "adequate" degree of mental orientation, displayed unimpaired concentration, had adequate receptive and expressive language skills, good mental flexibility, and "intact" abstract reasoning and functioning.  Dr. Littlejohn also found Carey's intelligence to be in the average range based on the WAIS-III intelligence test, and that, although Carey's cognitive function might be operating below her normal capabilities, she was not disabled in terms of pure cognition.

Dr. Littlejohn found that several aspects of the testing, including Carey's WAIS-III scores, suggested a loss of cognitive and concentration ability and were indicative of depression.  Dr. Littlejohn found that Carey was probably not malingering or exaggerating her symptoms.  Dr. Littlejohn concurred with findings by Dr. Grumet and Dr. Irons that Carey suffered from major depressive disorder.

 Broadspire did not ask Dr. Littlejohn to evaluate Carey's suitability to return to work, and Dr. Littlejohn did not evaluate Carey's ability to work at any job.  The only reference to Carey's work or leave status in the independent medical

examination occurred when Dr. Littlejohn referenced, apparently with approval, Dr. Grumet's opinion and diagnosis stating that Carey should be placed on disability leave from work.

Broadspire found that the independent medical evaluation, which occurred at its direction, was "lacking in exam findings" and failed to support a conclusion that Carey was unable to work in any occupation.

On October 20, 2005, Joseph Cimino ("Dr. Cimino") conducted another peer review of Carey's STD benefits claim at Broadspire's request.  Dr. Cimino reviewed information from Dr. Irons as well as the results of the independent medical examination conducted by Dr. Littlejohn.  Dr. Cimino concluded that the record failed to substantiate the presence of any impairments that would preclude Carey from being able to perform the core elements of "any type" of work.

On October 26, 2005, Carey's STD benefits claim was denied.  The denial was made effective retroactively from September 8, 2005.  Carey appealed this decision.  As part of the appeal process, Broadspire requested yet another peer review of Carey's claim.  Elana Mendelssohn ("Dr. Mendelssohn") conducted the review.  Dr. Mendelssohn considered the independent medical examination, the

records from Carey's treating physicians Dr. Grumet and Dana Henderson ("Dr. Henderson"),[2] and spoke with Dr. Grumet and Dr. Henderson.

On February 13, 2006, Dr. Mendelssohn concluded that the information she reviewed did not support the conclusion that Carey suffered a functional impairment that would preclude her from performing "any type" of work from September 8, 2005 through the present time.

On February 16, 2006, Carey, through counsel, forwarded Broadspire a letter from Dr. Grumet (the "February 16 Grumet Letter"). This letter stated that Dr. Grumet considered Carey "totally and permanently disabled for the foreseeable future . . . ." (February 16 Grumet Letter at 1.) Dr. Grumet's letter also stated:

> I might also add that on 2/10/2006 I had a very unsatisfactory conversation with a Dr. Mendelssohn at Broadspire. Dr. Mendelssohn had an angry and rude tone over the phone, was argumentative, and injected her opinions into my attempts to describe my findings and review those of Dr. Littlejohn. She turned a fact conversation into a debate, saying such things as "I have my own opinion of that [finding]."

(Id. at 1-2.)

---

[2]  Dr. Irons retired in November 2005. Dr. Henderson took over for Dr. Irons as one of Carey's treating physicians.

Broadspire, upon receiving the February 16 Grumet Letter, placed Carey's claim appeal on hold for thirty days.  On February 23, 2006, Broadspire requested yet another peer review, which was conducted by Leonard Schman ("Dr. Schman").  Dr. Schman reviewed Broadspire's file on Carey and spoke with Dr. Henderson.  Dr. Henderson stated that she had seen Carey only once, and that Carey appeared depressed and cried for most of the session.  Dr. Schman attempted to contact Dr. Grumet, but was unsuccessful.  Dr. Schman concluded that Dr. Henderson's report did not substantiate the presence of a psychological impairment precluding Carey from being able to perform any work from September 8, 2005 to the present.  On May 4, 2006, Broadspire denied Carey's appeal.

## II.   DISCUSSION

### A.   Motion to Enlarge Time

On June 25, 2007, in response to an unopposed motion by Carey, the Court granted an extension of time until July 5, 2007 to file a response in opposition to the present motion for summary judgment.  On July 3, 2007, Carey filed another request for extension, requesting ten additional days to file a response, which the Court granted on July 5, 2007.  Carey submitted her response on Monday, July 16,

2007, one day after the deadline.  Carey now moves for a one-day enlargement of time to render her response timely.

The Court may, "for good cause," grant a "motion made after the time has expired if the party failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1)(B).  Rule 6(b) "requires both a demonstration of good faith. . . and also it must appear that there is a reasonable basis for not complying within the specified period."  In re Four Seasons Sec. Laws Litig., 493 F.2d 1288 (10th Cir. 1974).  The Court has "extensive flexibility to modify the fixed time period throughout the rules, whether the enlargement is sought before or after the actual termination of the allotted time."  4B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 1165 (2d ed. 1987).

Carey's counsel claims that the reason for the late filing was a "mistaken calculation of the filing deadline," caused by an apparent miscommunication between Carey's counsel and her paralegal.  Carey's July 3, 2007, motion for extension requested an additional ten days.  The Court granted this motion on July 5, 2007, stating, "the Court GRANTS the request to enlarge time for Plaintiff to file a response to Defendant's Motion for Summary Judgment until July 15, 2007."

Carey claims that she informed her paralegal that the response deadline "had been extended 10 days."  The paralegal interpreted Carey's counsel to mean ten days as calculated under Rule 6(a), not including weekends, rather than ten calendar days from July 5 and July 15.  Accordingly, the paralegal scheduled the filing date for the response as July 16, 2007.  Relying on this internal note, Carey submitted the response one day late.

The Court finds that, in light of the standard filing practices of Rule 6(a), the mistake committed here was the result of excusable neglect.  Carey's counsel appears to have made this error in good faith.  The Court notes for future reference, and to eliminate any remaining ambiguity, that when it sets a deadline on a date certain, that date is the deadline, regardless of whether or not it falls on a day on which business is typically conducted.[3]

---

[3] The Court further finds that there is no prejudice to Defendant in granting this one-day retroactive enlargement of time.  BellSouth requested and received an extension of time to file its reply to this response.  BellSouth also requested and received leave to file supplemental findings of fact.

B.    Standard of Review

1.    *Summary Judgment Standard*

Summary judgment is appropriate where "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."

-14-

Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must

not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d

at 1246.  "Where the record taken as a whole could not lead a rational trier of fact

to find for the nonmoving party, there is no genuine issue for trial."  Scott v.

Harris, 127 S.Ct 1769, 1776 (2007).

> 2.    *ERISA Standard*

When evaluating a plan administrator's decision to deny benefits under a

plan governed by ERISA, the Court must determine the applicable standard of

review.  The Supreme Court has established three distinct standards: (1) *de novo*,

where the plan does not grant the administrator discretion; (2) "arbitrary and

capricious," where the plan grants the administrator discretion; and (3) "heightened

arbitrary and capricious," where the plan grants the administrator discretion but the

administrator operates under a conflict of interest.  See Firestone Tire & Rubber

Co. v. Bruch, 489 U.S. 101, 115 (1989); Williams v. BellSouth Telecomms., Inc.,

373 F.3d 1132, 1134 (11th Cir. 2004).

The *de novo* review standard does not apply where a plan contains "express

language 'unambiguous in its design' [giving] the Administrator discretionary

authority to determine eligibility for benefits or to construe the terms of the Plan."

Kirwan v. Marriott Corp., 10 F.3d 784, 789 (11th Cir. 1994).  The parties agree that the *de novo* standard does not apply here.

The Eleventh Circuit has established a multi-step analysis for considering ERISA claims for benefits under the remaining two standards.  First, the Court determines *de novo* whether the claim administrator's decision is "wrong (i.e., the court disagrees with the administrator's decision)."  Williams, 373 F.3d at 1138.  If the Court agrees with the administrator's denial of benefits, it should "end the inquiry and affirm the decision."  Id.   If the Court disagrees with the denial of benefits, it next determines "whether 'reasonable' grounds supported" the decision, and, if not, the Court should "end the inquiry and reverse the administrator's decision . . . ."  Id.

If the Court finds the administrator's decision wrong, but supported by reasonable grounds, the Court last determines whether a conflict of interest exists.  Id.  If no conflict exists, the arbitrary and capricious standard applies, and the Court must end the inquiry and affirm the decision.  Id.

The Court's role in determining claims under an arbitrary and capricious standard is limited to reviewing whether the decision was made "rationally and in good faith."  Guy v. Southeastern Iron Workers' Welfare Fund, 877 F.2d 37, 39

(11th Cir. 1989) (citation and quotation omitted).  If a reasonable basis exists for a good-faith decision, "it must be upheld . . . even if there is evidence that would support a contrary decision."  Jett v. Blue Cross & Blue Shield, 890 F.2d 1137, 1140 (11th Cir. 1989).

Carey argues that the heightened arbitrary and capricious standard applies, contending that Broadspire operated under a conflict of interest because it was paid by BellSouth to determine whether BellSouth should have to pay claims.  Carey's argument appears to rely on the presumption that BellSouth would have a conflict of interest if it were the claims administrator, and thus, necessarily, any paid agent acting as an administrator on BellSouth's behalf must have a conflict of interest. Using a similar line of reasoning, a district court in the Western District of North Carolina held that Kemper, a previous claims administrator for BellSouth's Long Term Disability Plan, operated under a conflict of interest.  Barnes v. BellSouth Corp., 2003 WL 22399567 (W.D.N.C., October 20, 2003) (unpublished).  That court reasoned, "[w]hen an entity is paid by an employer and wishes to continue that relationship, the entity has an incentive to minimize the payments that the employer must make."  Id. at *8.  The court's reasoning relied on the presumption

that any claims allowed by the administrator would be paid using the employer's funds.

In this case, Broadspire is a paid administrator for the BellSouth STD Plan. To the extent that BellSouth has an economic interest in avoiding paying claims under the Plan, Broadspire has an incentive to minimize those payments.  Claims under the BellSouth STD Plan are, however, not funded directly by BellSouth. Claims under the Plan are funded by a tax-exempt, irrevocable trust whose assets are used exclusively to provide benefits to Plan participants.  The trust is funded by BellSouth and other employer companies who participate in the Plan.  Benefits under the Plan are paid from the trust without regard to which employer the participant works for or what contributions were made by that employer. BellSouth pays claims to its employees through its payroll department, which is reimbursed on a monthly basis by the trust.  The Eleventh Circuit has held that the presence of a similar funding structure "eradicates any alleged conflict of interest so that the arbitrary and capricious standard of review applies."  Turner v. Delta Family-Care Disability and Survivorship Plan, 291 F.3d 1270, 1273 (11th Cir. 2002).

Because benefits are funded by a trust, and not by BellSouth, BellSouth does not have a direct or immediate financial conflict of interest.  Broadspire, therefore, has no implicit incentive to deny claims to retain BellSouth's favor or business. No conflict of interest existed in the administration of Carey's claim.  Accordingly, the Court will apply the "arbitrary and capricious" standard.

      C.    <u>Discussion</u>

          1.    *<u>Short Term Benefits</u>*

             a.    *The Plan*

The parties in this case have not significantly briefed the Court on the meaning of terms in the Plan.  The BellSouth STD Plan argues generally that the Plan permits disability benefits only for employees that are unable to perform "any work," which BellSouth STD Plan claims, means any work of any kind whatsoever.  The express terms of the Plan, however, do not support this construction.

Terms in ERISA policies should be defined consistently with specific definition provided in the policy.  <u>Brown v. Blue Cross and Blue Shield of Ala., Inc.</u>, 898 F.2d 1556, 1571 and n.17 (11th Cir. 1990).  Plan administrators must "adopt interpretations of plan provisions that are consistent with the *written* terms

of the plan."  Id.  Terms that are not defined specifically by the plan are interpreted according to their "plain and natural" meanings.  Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027, 1029-30 (11th Cir. 1994).

The STD Plan defines "disability" as "a medical condition supported by objective medical evidence which . . . makes a Participant unable to perform any type of work as a result of physical or mental illness or an accidental injury." (STD Plan at § 2.10.)  Broadspire relied on this language to deny Carey's claims, contending that the evidence did not show that Carey was incapable of "any type of work."  Broadspire's interpretation, however, ignores other language in the STD Plan which specifically defines the phrase "any type of work."

The STD Plan defines "any type of work" to "include[] the following  . . . (a) the Participant's regular job with or without accommodations, (b) any other Participating Company job with or without accommodations, or (c) temporary modified duties."  (Id.)  These categories of work are included "regardless of availability."  (Id.)

The STD Plan also specifically defines the term "Participating Company job."  The term is defined as "any job within a Participating Company or any job outside a Participating Company, which is comparable in skills and functions."

-20-

(Id.)  Although this definition does not state expressly what the job must be "comparable in skills and functions" to, the meaning of the phrase is clarified by context.  The phrase "Participating Company job" is used in the STD Plan in direct contradistinction to the "Participant's regular job."  (See id.)  Taken in context, it is clear that a "Participating Company job" is one "comparable in skills and functions" to the Participant's regular job.

To the extent that the BellSouth STD Plan construes the phrase "any type of work" to mean any type of work at all, that construction contradicts the express terms of the STD Plan and is therefore wrong and unreasonable.

The Court construes "any type of work" to mean work that falls into one of three categories, regardless of whether BellSouth or any other participating company has a job available in any particular category: (1) the participant's regular job, with or without accommodations; (2) a job comparable in skills and functions to the participant's regular job, with or without accommodations; or (3) temporary modified duties.[4]

_____

[4]  Although this construction of "any type of work" is extremely broad, it is narrower than the categorical definition argued by the BellSouth STD Plan. BellSouth's definition includes any type of work at all, without limitation, even types of work that are not even theoretically available at BellSouth or a competing company.  The STD Plan, however, defines "any type of work" to specific

b.     *Broadspire's Claim Denial*

The Court finds that Broadspire not only applied the wrong definition of disability, it also failed to develop a sufficient administrative record to determine Carey's disability status under any standard.  The Court finds further that questions of fact exist regarding whether Broadspire's determination was made rationally and in good faith.

"ERISA and its accompanying regulations essentially call for a meaningful dialogue" between insurers and insured.  Abram v. Cargill, Inc., 395 F.3d 882, 886 (8th Cir. 2005) (citations omitted).  Because Broadspire's duty to provide benefits "is a continuing one, its refusal to provide benefits is thus a continuing denial, the propriety of which is measured against the information available from time to time."  Shannon v. Jack Eckerd Corp., 113 F.3d 208, 209 (11th Cir. 1997).

BellSouth first failed to apply the correct standard of "disability" to Carey's case.  The administrative record shows that BellSouth's multiple peer reviewers concluded that there was insufficient evidence to conclude that Carey was unable to perform "any work."  This is simply not the determination called for by the Plan.

---

categories of duty that, necessarily, must be at least theoretically capable of being offered by BellSouth or a participating company, even if a position with such duties is not actually available to be filled.

To deny benefits, BellSouth was required to find that Carey had not provided objective medical evidence showing that she was unable to perform her own job, a comparable job, or temporary modified duties, with or without accommodation. As noted above, these categories are broad, but not as all-encompassing as the "any work" standard Broadspire appears to have relied on.

Broadspire also failed to develop an adequate administrative record in this case. There is no evidence in the record from Dr. Littlejohn, the independent medical examiner, or from Broadspire's peer reviewers, indicating that they evaluated whether Carey was specifically unable to perform her own job, with or without accommodations, a comparable job, with or without accommodations, or temporary modified duties. Dr. Littlejohn specifically was not asked to evaluate Carey's capacity to work under any standard, including the proper standard in this case. In other words, the dialogue between insurer and insured that ERISA is intended to encourage was, in this case, never completed. From the available administrative record, the Court cannot determine whether Carey is disabled under the Plan.

Further, an issue of fact exists regarding whether Broadspire sought in good-faith to obtain information from which it could determine what the objective

medical evidence showed concerning Carey's disability status.  At the time Carey

sought the benefits at issue in this case, she had a history of disabling mental

illness, including at least one prior instance of disabling major depression certified

by Dr. Glassman, one of BellSouth's own peer reviewers.  Carey's treating

physicians, Dr. Irons and Dr. Grumet, stated on multiple occasions that Carey had

serious mental disabilities.  Neither Dr. Irons nor Dr. Grumet ever cleared Carey to

return to work, and both made other statements that Carey was unable to work.  Dr.

Grumet, in the February 16, 2006 Letter, unambiguously and categorically

informed Broadspire that Carey was unable to perform any work.

Broadspire's investigation, which included multiple peer reviews and an

independent medical evaluation, did not establish any facts that would contradict

the categorically expressed opinions of Carey's treating physicians.  Dr. Littlejohn,

a physician chosen by Broadspire to perform the independent medical examination,

appears to have adopted Dr. Grumet's opinion that Carey was disabled.  Broadspire

did not ask Dr. Littlejohn directly to evaluate if Carey was disabled within the

meaning of the Plan.

The peer reviewers consulted by Broadspire did not examine Carey

themselves.  Instead, they appear to have reviewed the administrative record, the

independent medical exam, and, on some occasions, spoke with Dr. Irons or

Dr. Grumet.  The peer reviewers did not make any positive findings regarding

Carey's mental health condition; instead, they merely concluded that the record

provided to them by Broadspire did not prove that she was incapable of performing

any work.  At least one of these peer reviewers–Dr. Mendelssohn–may have lacked

objectivity, and, according to the uncontroverted affidavit of Dr. Grumet,

Dr. Mendelssohn was unobjectively antagonistic to Dr. Grumet's diagnosis and

opinion that Carey was disabled.  This antagonism interfered with an objective,

fact-based assumption of her condition.  Dr. Schman, the last peer reviewer to

examine Carey's case, failed to contact Dr. Grumet or Dr. Irons.

    Rather than continue to investigate until it had a reasonable factual basis to

determine whether Carey could perform her own job, a comparable job, or

modified temporary duties, Broadspire sought to rely on the absence of information

in the administrative record as a grounds to deny her claim.  The administrative

record, on its face, raises an issue of fact as to whether Broadspire attempted to

make a good-faith determination, or merely tried to deconstruct the record in a way

that might justify denying her claim.  Because an issue of fact exists regarding

whether Broadspire may have caused or contributed to the inadequacy of the

administrative record, or otherwise failed to engage in a good-faith dialogue with Carey in the claims determination process, the Court finds that an issue of fact exists regarding whether the determination is *de novo* wrong.

An issue of fact also exists regarding whether the denial of benefits was arbitrary and capricious.  "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, the outcome is not arbitrary and capricious."  Davis v. Ky. Fins. Cos. Ret. Plans, 887 F.2d 689, 693 (6th Cir. 1989) (citation and quotation omitted).  A decision to deny benefits must, however, "be supported by substantial evidence in order to avoid being found arbitrary and capricious."  Jett v. Blue Cross and Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).

As noted above, the administrative record contains substantial objective evidence that Carey was disabled within the meaning of the Plan.  The only evidence in the record offered by Broadspire to support a contrary conclusion are statements by Dr. Grumet and Dr. Irons that might be interpreted to allow the possibility that Carey could work.  Broadspire relies primarily on the June 28 Update submitted by Dr. Irons and the July 22 Leave Form submitted by Dr. Grumet.  These statements, however, do not establish as a matter of law reasonable

grounds for Broadspire to conclude that Carey was capable of performing her job, a comparable job, or modified temporary duties.

The June 28 Update, for example, provided three options for "return to work status": a box for setting a date for release to work full duty, a box stating "able to work with the following modifications," and a box stating "unable to work at this time."  Dr. Irons checked the box stating "unable to work at this time."  Making all inferences in favor of the non-moving party, as the Court must, the Court finds that this statement must be construed as Dr. Irons's opinion that Carey was unable to perform any work.

Broadspire relies on the fact that Dr. Iron failed to check a box stating "unable to perform any work at this time" found earlier on the form, and entered cautionary comments about what should be done if Carey was required to return to work despite the recommendation that she was not able to work.  These entries do not, as BellSouth claims, transform Dr. Irons's clearly expressed opinion that Carey was "unable to work" into an opinion embracing the opposite conclusion.  Making all inferences in Carey's favor, the July 28 Update does not support denying her claim for benefits.  The form, at best, should have prompted BellSouth to seek clarification of Dr. Irons's opinion of Carey's ability to perform her own

job, a comparable job, or temporary modified duties.  Dr. Burstein, Broadspire's

peer reviewer, conducted a follow-up conversation with Dr. Irons, but the

administrative record does not show any evidence that this conversation clarified

any ambiguities in the July 28 Update.  For example, while Dr. Burstein's notes

state that Dr. Irons"expressed the opinion that [Carey] would be able to perform

work," Dr. Burstein also notes that Carey's "actual capacity" to perform

work–even unskilled or semiskilled labor–"cannot be determined."  (Adm. Record

at 401-402.)

In the July 22 Leave Form, Dr. Grumet checked a box indicating that Carey

required "Absence [from work] plus treatment."  Dr. Grumet also checked a box

indicating that Carey was "incapacitated."  In response to the question "If medical

leave is required for the employee's absence from work, is the employee able to

perform work of any kind?" Dr. Grumet checked the box indicating "Yes."

Taken by itself, the July 22 Leave Form is ambiguous regarding Carey's

disability status, and does not as a matter of law provide a rational basis for

Broadspire to deny Carey's claim.  The July 22 Form is not, however, the only

document from Dr. Grumet in the administrative record.  Dr. Grumet clarified any

ambiguity created by the July 22 Leave Form with his later communications with

Broadspire.  On August 27, 2005, Dr. Grumet filled out another Broadspire "Behavioral Health Clinician Statement."  He checked a box indicating he recommended that Carey stay home from work, commenting that Carey was "unable to attend work," "regularly unable to concentrate on details," "unable to relate consistently with others," and that these impairments were "all resulting from psychiatric illness."  Dr. Grumet checked a box indicating that Carey had "suicidal ideations" and was a risk to herself or others.  One section of the Statement contained boxes providing three options: (1) "released to work full duty"; (2) "able to work with accommodations"; and (3) "unable to work at this time".  Dr. Grumet checked the box stating that Carey was "unable to work at this time."  On February 16, 2006, Dr. Grumet sent Broadspire an emphatic letter repeating many of these conclusions.  In the February 16, 2006 letter, Dr. Grumet categorically stated that Carey was unable to perform any work.

In response to the June 28 Update and July 22 Leave Form, Broadspire demanded an independent medical examination.  Broadspire does not appear to have asked Dr. Littlejohn, who conducted the examination, to form an opinion on whether Carey was able to perform her own job or a comparable job, with or

without accommodations, or temporary modified duties.[5] Dr. Littlejohn references, with apparent approval, Dr. Grumet's opinion that Carey was disabled.

Broadspire's peer reviews all relied on the administrative record, the independent medical examination, and discussions with Dr. Grumet, Dr. Irons, and Dr. Irons's replacement Dr. Henderson. As noted above, issues of fact exist concerning the good faith and thoroughness of investigation in these reviews. Dr. Mendelssohn appears to have argued with Dr. Grumet over the phone in an effort to secure an opinion justifying denial of Carey's claims.

After Broadspire received the statement of disability in Dr. Grumet's February 16, 2006 letter, it ordered a peer review by Dr. Schman. Dr. Schman,

---

[5] The administrative record also suggests that Broadspire did not ask Dr. Littlejohn whether Carey was capable of performing "any work," the standard it applied throughout Carey's case.

however, did not contact Dr. Irons or Dr. Grumet[6] in determining that Carey's claim should be denied.

The record contains some objective evidence that Carey was disabled within the meaning of the Plan.  Issues of fact exist regarding the reasonableness of Broadspire's determination that this evidence was insufficient and on whether Broadspire investigated Carey's claim in good faith.  These significant issues of fact, like the issue of Carey's disability status, cannot be resolved by the Court on the current administrative record.

2.    *Remedy*

This case is unique in the Court's experience.  The administrative record is inadequate, and, to the extent it provides information, it raises issues of fact concerning the reasonableness and good faith of Broadspire's decision to deny

---

[6] Dr. Schman contacted Dr. Henderson, Dr. Irons replacement.  When Dr. Henderson revealed that she had very little experience with Carey, Dr. Schman does not to appear to have contacted Dr. Irons, who had retired.  Dr. Schman claims to have attempted to contact Dr. Grumet on two occasions.  Without passing judgment on whether this effort satisfies Broadspire's good faith duties, the Court merely notes that speaking with Dr. Grumet would seem to be a reasonable and essential part of a peer review conducted solely because of a letter written by Dr. Grumet.  Dr. Schman's failure to consult with Dr. Irons or Dr. Grumet, on the facts of this case, contributes to the Court's inability to grant summary judgment.

benefits.  The Court does not, and cannot on the available record, rule on these issues.  Remand is a proper remedy where further factual determinations are required to determine a plan participant's entitlement to benefits.  <u>Scarpulla v. Bayer Corp. Disability Plan</u>, 514 F.Supp. 2s 1262, 1280 (N.D. Ala. 2007); <u>see also</u>, <u>Williams v. International Paper Co.</u>, 227 F.3d 706 (6th Cir. 2000); <u>Fallo v. Amoco Corp.</u>, 102 F.3d 918 (7th Cir. 1996); <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066 (2d Cir. 1995).

The Court, accordingly, remands this case for further factual development. Broadspire must reevaluate Carey's claims based on an adequate factual record. The Court suggests that this record contain opinions specifically tailored to the applicable standard in this case, notably those of Dr. Littlejohn, Dr. Grumet, and Dr. Irons.  Broadspire must then reevaluate Carey's claims consistent with the proper standard of disability, as set forth in this Order.

If  Broadspire then determines that Carey is not entitled to benefits, and Carey in good faith believes that determination to be wrong, she may continue to pursue a remedy in this Court.

3.   *Long Term Benefits*

BellSouth argues that Carey's claims for long-term disability ("LTD") benefits should be denied.  Under ERISA, a plaintiff must exhaust available administrative remedies before initiating suit in federal court.  Perrino v. Southern Bell Tel. & Tel. Co., 209 F.3d 1309, 1315 (11th Cir. 2000).  The Court, however, "has the sound discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate."  Id.

The Amended Complaint in this action alleges a cause of action for wrongful denial of STD benefits under 29 U.S.C. § 1132(a)(1)(B).  There is no cause of action for wrongful denial of LTD benefits.  Carey mentions lost LTD benefits as a potential basis for damages from losing her employment of BellSouth, which she alleges was caused by the denial of STD benefits.  Carey claims she would be automatically entitled to LTD benefits once she has exhausted 52-weeks of STD benefits.

Carey does not argue that it would be futile or inadequate for her, if she prevailed in this litigation, to follow BellSouth's administrative procedure for obtaining LTD benefits.  Carey appears to assert some form of entitlement to LTD benefits in her response in opposition to the motion for summary judgment.  To the

-33-

extent that Carey seeks an award of LTD benefits in this action, the Court finds that Carey has not exhausted her administrative remedies and is barred from asserting a cause of action for LTD benefits.  Carey may assert her claims for LTD benefits in conjunction with the Court's remand of the determination of STD benefits.

## III.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that BellSouth Short Term Disability Plan's Motion for Summary Judgment [25] is **DENIED**

**IT IS FURTHER ORDERED** that this case is **REMANDED** to Defendant for the purposes of:

(1) developing a complete factual record on the issue of whether Carey was capable of performing her own job, with or without accommodations, a comparable job, with or without accommodations, or temporary modified duties; and

(2) applying the proper standard for "disability," as set forth in this Order, to an adequate administrative record to determine whether Carey is entitled to STD (or LTD) benefits.

**IT IS FURTHER ORDERED** that BellSouth's Motion to File

Supplemental Statement of Undisputed Facts and Accompanying Documents [35]

is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Valerie E. Carey's Motion to

Enlarge Time to File Response to Defendant's Motion for Summary Judgment [36]

is **GRANTED**.

**SO ORDERED** this 17th day of January, 2008.



_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE